United States Court of Appeals,

Fifth Circuit.

No. 95-20155.

GUNDLE LINING CONSTRUCTION CORPORATION, Plaintiff,

and

United States Fidelity & Guaranty Company, Defendant/Third-party Plaintiff/Appellee,

v.

ADAMS COUNTY ASPHALT, INC., Kimbob, Inc., and Robert M. Mumma, II, Third-party Defendants/Appellants.

June 13, 1996.

Appeal from the United States District Court for the Southern District of Texas.

Before BARKSDALE, DeMOSS and PARKER, Circuit Judges.

ROBERT M. PARKER, Circuit Judge:

This diversity case was filed in the Southern District of Texas by a Texas corporation seeking to recover on a bond issued by the defendant. The defendant, a resident of Maryland, filed a third-party complaint seeking indemnification from the third-party defendants, who were the principals on the bond. The third-party defendants, all residents of Pennsylvania, filed motions to dismiss wherein they challenged the district court's *in personam* jurisdiction. The district court denied their motions. The plaintiff and defendant ultimately settled the underlying claim. The district court then granted summary judgment to the third-party plaintiff on its indemnity claim. The third-party defendants appealed, challenging the district court's decisions as to personal jurisdiction, venue, and the grant of summary judgment to the

1

third-party plaintiff.  Finding that personal jurisdiction was proper as to only one of the third-party defendants, we affirm in part and reverse in part.

FACTS AND PROCEDURAL HISTORY

Adams County Asphalt, Inc. ("Adams Inc.") contracted with the City of Harrisburg, Pennsylvania to perform a large project ("Harrisburg project") involving the city's waste disposal system. Adams Inc. is owned by Robert Mumma II ("Mumma"), who also owns Kimbob, Inc ("Kimbob Inc."). Adams Inc. obtained a payment bond for the benefit of all persons furnishing labor, material, or both on the Harrisburg project from United States Fidelity & Guaranty Company ("USF & G"). USF & G entered into a Master Security Agreement ("MSA") with Adams Inc., Kimbob Inc., and Mumma as indemnitors to secure reimbursement to USF & G of any payments it made in good faith on claims against the bond.

Adams Inc., as general contractor, entered into a subcontract with Gundle Lining Construction Corporation ("Gundle") of Houston, Texas to supply and install certain materials for the Harrisburg project.  The project owner had specified that Adams Inc. subcontract with Gundle because Gundle had designed the portion of the project that was to employ Gundle's materials.

During the course of construction, a dispute arose between Adams Inc. and Gundle regarding the quantity of the material Gundle had agreed to supply for the project and the quality of its installation.  Adams Inc. paid Gundle the amount for which it had contracted but refused to pay Gundle for amounts in excess of the

2

original contract.

Rather than pursue Adams Inc. on its claim, Gundle elected to make a claim for payment against the payment bond. After USF & G refused to pay the claim, Gundle filed suit against USF & G in Texas state court to recover on the bond. The suit was then removed to federal district court based upon diversity jurisdiction. Seeking indemnification, USF & G filed third-party complaints against Adams Inc., Kimbob Inc., and Mumma ("third-party defendants"), claiming that it was entitled to recover all amounts paid to Gundle from its indemnitors. Shortly thereafter, Gundle and USF & G settled their action for $121,000 (the amount of Gundle's claim against the bond), and Gundle agreed to dismiss its claim against USF & G.

The third-party defendants, all non-residents of Texas, filed, *inter alia,* motions to dismiss for lack of personal jurisdiction. USF & G countered with a motion for summary judgment. In October 1993, the district court denied the third-party defendants' motions for dismissal. Then, nearly a year and a half later, the district court granted USF & G's motion for summary judgment. The third-party defendants then timely perfected this appeal.

ANALYSIS

I. Personal Jurisdiction

It is undisputed that none of the parties to this appeal are residents of Texas. When the jurisdictional facts are not in dispute this court conducts a *de novo* review of the district court's determination that its exercise of personal jurisdiction

over a nonresident defendant is proper. *Bullion v. Gillespie,* 895 F.2d 213, 216 (5th Cir.1990). In analyzing the district court's decision to exercise personal jurisdiction over a nonresident defendant, it is important to bear in mind that the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident. *Stuart v. Spademan,* 772 F.2d 1185, 1192 (5th Cir.1985).

In a diversity suit a federal court has jurisdiction over a nonresident defendant to the same extent that a state court in that forum has such jurisdiction. *Wilson v. Belin,* 20 F.3d 644, 646 (5th Cir.), *cert. denied,* --- U.S. ----, 115 S.Ct. 322, 130 L.Ed.2d 282 (1994). The reach of a state court's jurisdiction is delimited by: (1) the state's long-arm statute; and (2) the Due Process Clause of the Fourteenth Amendment to the federal Constitution. *Bullion,* 895 F.2d at 215. The Texas long-arm statute authorizes the exercise of jurisdiction over nonresidents "doing business" in Texas. Tex.Civ.Prac. & Rem.Code § 17.042. The Texas Supreme Court has interpreted the "doing business" requirement broadly, allowing the long-arm statute to reach as far as the federal Constitution permits. *Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex.1990). Consequently, we will analyze the exercise of personal jurisdiction over nonresidents with reference to federal constitutional limits. *See Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702 n. 10, 102 S.Ct. 2099, 2104 n. 10, 72 L.Ed.2d 492 (1982) (the restriction on state power to subject a nonresident to suit is "ultimately a function of the individual

liberty interest preserved by the Due Process Clause").

The exercise of personal jurisdiction over a nonresident will not violate due process principles if two requirements are met. First, the nonresident defendant must have purposefully availed himself of the benefits and protections of the forum state by establishing "minimum contacts" with that forum state. *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). The defendant's conduct and connection with the forum state must be such that he should reasonably anticipate being haled into court in the forum state. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 296, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

Second, the exercise of jurisdiction over the nonresident defendant must not offend "traditional notions of fair play and substantial justice." *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 113, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987) (quoting *International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158).

The "minimum contacts" prong of the inquiry may be further subdivided into contacts that give rise to "specific" personal jurisdiction and those that give rise to "general" personal jurisdiction. It is indisputable that if there is personal jurisdiction over the defendants in the instant case it exists by virtue of "specific" personal jurisdiction. Consequently, our review is limited to this subdivision of the minimum contacts analysis.

The district court's exercise of specific jurisdiction is

5

appropriate only when the nonresident defendant's contacts with the forum state arise from, or are directly related to, the cause of action. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 1872 n. 8, 80 L.Ed.2d 404 (1984). To exercise specific jurisdiction, the court must examine the relationship among the defendant, the forum, and the litigation to determine whether maintaining the suit offends traditional notions of fair play and substantial justice. *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 2579, 53 L.Ed.2d 683 (1977).

*A. Jurisdiction as to Adams, Inc.*

### 1. "Minimum contacts"

Adams Inc.'s contacts with Texas can be summarized as follows: (1) Adams Inc. entered into a contract with Gundle, a Texas entity, pertaining to the construction project in Pennsylvania, (2) it mailed payments to Gundle at Gundle's Texas address, and (3) it, a nonresident, engaged in communications with a resident during the course of developing and carrying out the contract. We have previously held that the combination of mailing payments to the forum state, engaging in communications surrounding the execution and performance of a contract, and the fact that a nonresident enters into a contract with a resident are insufficient to establish the requisite minimum contacts necessary to support the exercise of personal jurisdiction over a nonresident defendant. *See Spademan,* 772 F.2d at 1193.

However, the *Spademan* court was careful to recognize that one factor that might affect the minimum contacts analysis is the

actual language present in the contract itself. *Id.* The court, quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), stated:

> If the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot.... Instead, we have emphasized the need for a "highly realistic" approach that recognizes that a "contract" is "ordinarily but an intermediate step serving to tie up prior business negotiations and contemplated future consequences which themselves are the real object of the business transaction." ... It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.

*Spademan,* 772 F.2d at 1193 (citations omitted). Guided by the direction of the Supreme Court and this court's well-reasoned opinion in *Spademan,* we review the terms of the contracts at issue in the instant case in order to determine if they, along with the defendant's other contacts with Texas, were sufficient to confer jurisdiction over Adams Inc.

In examining the terms of the contracts in the instant case, Adams Inc. contends that we should look only to the Master Security Agreement ("MSA") which was executed between USF & G and Adams Inc. on April 10, 1990. In the MSA, Adams Inc. agreed to:

> exonerate, indemnify, and keep indemnified SURETY [USF & G] from and against any and all liabilities, losses and expenses of whatsoever kind or nature ... incurred by SURETY by reason of: (1) Surety having executed, provided or procured BOND(S) in behalf of PRINCIPAL [Adams Inc.], or (2) UNDERSIGNED'S failure to perform or comply with any provisions of this AGREEMENT.

Examining this document alone, we would agree with Adams Inc. that it is insufficient to confer jurisdiction over them. However, when

7

examining personal jurisdiction we do not subscribe to such a myopic approach. Instead, our approach is "highly realistic", cognizant of the commercial realities of the transactions that form the basis of the nonresident defendant's contacts with the forum state. Therefore, we look not only to the MSA but also to the bond agreement between Adams Inc. and USF & G, which states:

> [a]ll persons who have performed labor, rendered services or furnished materials ... shall have a direct right of action against the Principal [Adams Inc.] and Surety [USF & G] on this bond, which right of action shall be asserted in proceedings instituted in the State in which such labor was performed, services rendered, or materials furnished.

In *Spademan* the plaintiffs argued that a choice-of-law provision contained in the contract between the parties was sufficient to establish the necessary contacts with the forum state. The provision "specified that the agreement would be construed and enforced in accordance with the law of the state in which the "aggrieved party' is residing at the time of the breach or grievance." *Spademan,* 772 F.2d at 1194. The court found that the provision was insufficient, either standing alone or when considered with the other contacts, so as to justify the exercise of jurisdiction over the defendant. *Spademan,* 772 F.2d at 1196. In its analysis of the choice-of-law provision the court stated:

> At the outset, we note that the plaintiffs misapprehend the very nature of this contractual provision. *The provision contemplates a choice of law not forum.* Hence, despite plaintiffs' protestations to the contrary, the provision of itself does not evince [plaintiffs'] anticipation of being haled into a Texas court.

*Spademan,* 772 F.2d at 1195 (emphasis added). Although the contractual provision contained in the labor and materialman's bond

8

executed between USF & G and Adams Inc. is neither a choice-of-law provision nor an express choice-of-forum provision, it resembles the latter.

We recognize that under the labor and materialman's bond Adams Inc. did not agree to have any disputes arising between itself and USF & G settled in a specific forum. However, it agreed that any cause of action brought to recover on the labor and materialman's bond was subject to being tried in any "State in which such labor was performed, services rendered, or materials furnished." This acknowledgment by Adams Inc. weighs heavily against its contention that the Texas court's decision to exercise jurisdiction over it would somehow be unreasonable. *See Kevlin Sevrs. Inc. v. Lexington State Bank,* 46 F.3d 13, 15 (5th Cir.1995) (district court erred in refusing to enforce forum selection clause and subsequently dismissing suit for lack of personal jurisdiction because a forum selection clause in a written contract is prima facie valid and enforceable unless the opposing party can show that the enforcement of the provision would be unreasonable).

We are aware of the fact that, unlike the choice-of-law provision at issue in *Spademan* involving an agreement between a non-resident and a resident, the agreements between USF & G and Adams Inc. involve only non-residents. While this fact, standing alone, would appear to move the bond agreement outside of our jurisdictional analysis, it is relevant to the analysis in that it indicates what future consequences Adams Inc. should have contemplated when it contracted with Gundle.

9

But for USF & G's decision to act as surety for Adams Inc., USF & G never would have found itself being sued by a Texas corporation in a Texas court. Under the MSA, Adams Inc., prior to entering into the subcontract with Gundle, agreed to indemnify USF & G for any payments made under the bonds it issued. On April 23, 1990, Adams Inc. and USF & G executed the labor and materialman's bond in which Adams Inc. acknowledged that, as contractor, it could be subject to suit in any state in which labor was performed or materials were furnished. Then, on May 24, 1990, Adams Inc. entered into a subcontract with Gundle, a Texas corporation which Adams Inc. knew would be performing services and rendering labor in Texas.

The sequence of contractual commitments made by Adams Inc., concluding with the subcontract with Gundle, should have made Adams Inc. aware that it was subject to being haled into a Texas court. *See World-Wide Volkswagon Corp.,* 444 U.S. at 296, 100 S.Ct. at 567. Consequently, we find that Adams Inc.'s express acknowledgment that it was subject to suit in any state where labor was performed or materials furnished and its subsequent decision to contract with Gundle, along with the other aforementioned contacts, are sufficient to satisfy the "minimum contacts" prong of the personal jurisdiction analysis.

2. "Fair play and substantial justice"

Once there has been a determination that the defendant purposefully directed its activities at the forum state, the defendant "must present a compelling case that the presence of some

10

other considerations would render jurisdiction unreasonable." *Burger King Corp.,* 471 U.S. at 477, 105 S.Ct. at 2185. When determining the fundamental fairness issue this court will normally examine (1) the defendant's burden; (2) the forum state's interests; (3) the plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Asahi,* 480 U.S. at 113, 107 S.Ct. at 1033; *World-Wide Volkswagon Corp.,* 444 U.S. at 292, 100 S.Ct. at 564.

Adams Inc. again urges us to restrict our view when examining whether the exercise of personal jurisdiction over it comports with fair play and substantial justice, asserting that Texas has no interest in this litigation because the Texas company that filed this lawsuit, Gundle, is no longer a party to the action by virtue of its decision to settle with USF & G. If we were to adopt this argument then we would be discouraging parties, such as USF & G, from settling for fear that they might have to pursue third-party defendants in separate actions in order to obtain the indemnification that those third-party defendants had contractually bound themselves to provide.[1] This approach is contrary to a convenient and effective resolution of the dispute for the plaintiff; it is contrary to the judicial systems' interest of

---

[1]Of course, the nonresident third-party defendants to which we refer would still have to have "minimum contacts" with the forum state in order to justify the district court's exercise of jurisdiction.

11

efficiently resolving controversies; and it is contrary to the forum state's interest in providing for an effective means of redress for its citizens.

We recognize that there is some burden placed on Adams Inc., a Pennsylvania corporation, as a result of the case being tried in Texas. However those burdens do not present the type of compelling reasons necessary to justify a finding that the exercise of jurisdiction over Adams Inc. is contrary to notions of fair play and substantial justice.

B. *Jurisdiction as to Mumma and Kimbob Inc.*

It is undisputed that Mumma and Kimbob Inc. had no contacts with Texas. However, USF & G offered three arguments as to why the exercise of jurisdiction over them would be proper. First, USF & G argues that by signing the MSA, Mumma and Kimbob Inc. somehow entered into a contract that was performable in Texas. While Mumma's and Kimbob Inc.'s signatures on the MSA might obligate them to indemnify USF & G, the MSA, standing alone, is insufficient to establish the requisite contacts with the forum state.

Second, USF & G contends that by signing the MSA, Mumma and Kimbob Inc. put themselves at financial risk so that Adams Inc. could procure the project contract and do business with Gundle in Texas, and that this fact is somehow sufficient to support the exercise of jurisdiction over these two defendants. In support of this argument they cite this court to *National Can Corp. v. K. Beverage Co.,* 674 F.2d 1134 (6th Cir.1982), a case that is readily distinguishable.

12

In *National Can* the court examined the contacts of nonresident individual guarantors in order to determine if those contacts supported the forum state's exercise of jurisdiction over the nonresidents. At issue, *inter alia,* were the contacts of two individual guarantors who had never set foot in the forum state. The court ultimately found that the defendants had sufficient contacts to support the exercise of jurisdiction and cited three factors in support of its decision.

First, the court found that the defendants knew that the business they were guaranteeing was to be located in Kentucky, the forum state, which made it reasonable for the defendants to anticipate being haled into court in Kentucky. *Id.* at 1138. Second, the guaranty agreements formed the basis of the action. *Id.* Third, the court found that the dispute had a substantial enough connection with Kentucky to compel the defendants to defend the suit there. *Id.*

The first two criteria that supported the exercise of jurisdiction over the nonresident defendants in *National Can* weigh against exercising jurisdiction over Mumma and Kimbob Inc. First, the guarantee agreement in the instant case, the MSA, contained no statement concerning where the obligations that the defendants were guaranteeing were to be performed. In fact, the bonds that Mumma and Kimbob Inc. were purporting to guarantee had not yet been issued. Second, the guarantee agreement was not the basis of the initial lawsuit initiated by Gundle. While the dispute may have a connection with Texas, that fact alone is insufficient to justify

13

the exercise of jurisdiction over Mumma and Kimbob Inc.

USF & G's final argument in support of the exercise of jurisdiction over Mumma and Kimbob Inc. is that we should regard them as alter egos of Adams Inc. They contend that, as alter egos, the contacts of Adams Inc. are attributable to both Mumma and Kimbob Inc., thereby justifying the exercise of jurisdiction. Although USF & G cites no binding authority for this argument, we agree that under Texas law, a finding by the district court that Mumma and Kimbob Inc. were alter egos of Adams Inc. would have permitted the lower court to disregard the corporate fiction and pierce the corporate veil, thereby attributing Adams Inc.'s contacts to its codefendants. *See S. Villar, Etc., et al. v. Crowley Maritime Corp.,* 990 F.2d 1489, 1496 (5th Cir.1993). The only evidence offered to the trial court by USF & G in support of its alter ego theory was to provide financial evidence relating to Kimbob Inc. and Adams Inc. Consequently, our review is limited to examining this evidence in order to determine if it is sufficient to support a finding of alter ego status.[2]

This circuit has developed the following laundry list of factors to be used when determining whether a subsidiary is the alter ego of the parent:[3]

_____

[2]The district court made no findings and issued no opinion on the issue of personal jurisdiction. The trial court's disposition of this issue is limited to a one sentence denial of the defendants' motions to dismiss for lack of personal jurisdiction.

[3]We are mindful that we are not dealing with a parent-subsidiary relationship in the instant case. However, the factors used for determining whether a subsidiary is an alter ego

14

(1) the parent and the subsidiary have common stock ownership;

(2) the parent and the subsidiary have common directors or officers;

(3) the parent and the subsidiary have common business departments;

(4) the parent and the subsidiary file consolidated financial statements and tax returns;

(5) the parent finances the subsidiary;

(6) the parent caused the incorporation of the subsidiary;

(7) the subsidiary operates with grossly inadequate capital;

(8) the parent pays the salaries and other expenses of the subsidiary;

(9) the subsidiary receives no business except that given to it by the parent;

(10) the parent uses the subsidiaries property as its own;

(11) the daily operations of the two corporations are not kept separate;  and

(12) the subsidiary does not observe the basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings.[4]

*United States v. Jon-T Chemicals, Inc.,* 768 F.2d 686, 691-92 (5th

---

of its parent provide guidance in determining whether Kimbob is an alter ego of Adams Inc.  This court has also approved of the application of the *Jon-T* factors to situations where it is asserted that an individual is an alter ego of a corporation. *See Century Hotels v. United States,* 952 F.2d 107, 110 (5th Cir.1992).

[4]In 1989 the Texas legislature amended it Business Corporation Act.  The amendments removed "failure to observe corporate formalities" from the list of factors used in proving alter ego theories.  *See* Tex.Bus.Corp. art. 2.21 A(3);  *see also Western Horizontal Drilling, Inc. v. Jonnet Energy Corp.,* 11 F.3d 65, 67 (5th Cir.1994) (interpreting the effect of art. 2.21 A(3)).  Consequently, we will not consider this factor in our analysis.

Cir.1985) (internal citations omitted), *cert. denied,* 475 U.S. 1014, 106 S.Ct. 1194, 89 L.Ed.2d 309 (1986).  Resolution of alter ego issues must be based on a consideration of "the totality of the circumstances."  *Id.* at 694.

Concerning its argument that Kimbob Inc. is the alter ego of Adams Inc., USF & G presented no evidence or argument on the following factors listed above:  (1) common stock ownership, (2) common officers and directors (with the exception of Mumma), (3) common business departments, (4) the filing of joint tax returns, (5) who caused the incorporation of Kimbob Inc. or Adams Inc., (6) how the corporations receive their business, (7) whether the corporations share property, and (8) the daily operations of the two corporations.  In fact, the evidence that USF & G did submit on this issue indicates that the corporations neither operate with grossly inadequate capital nor do they pay one another's salaries and expenses.  In short, USF & G failed to present sufficient evidence to demonstrates that Kimbob Inc. is an alter ego of Adams Inc.

In addition to examining the *Jon-T* factors for purposes of determining whether an individual is an alter ego of a corporation, courts will examine the total dealings of the corporation and the individual, the amount of financial interest the individual has in the corporation, the ownership and the control that the individual maintains over the corporation, and whether the corporation has been used for personal purposes.  *Permian Petroleum Co. v. Petroleos Mexicanos, a/k/a Pemex,* 934 F.2d 635, 642 (5th Cir.1991)

16

(citing *Castleberry v. Branscum,* 721 S.W.2d 270, 272 (Tex.1986)).

In support of its alter ego theory between Mumma and Adams Inc., USF & G offered evidence of Mumma's signature on the MSA and on checks from Adams Inc. to Gundle. USF & G also asserts that Mumma's personal assets guarantee the bank debt of Adams Inc. However, it offered no evidence to support this assertion. Therefore, the only evidence to support its alter ego theory is Mumma's signature on the MSA and on Adams Inc.'s checks to Gundle. This evidence is wholly insufficient to support an alter ego theory. USF & G had the burden of establishing that the court had personal jurisdiction over Mumma and Kimbob. They failed to meet that burden.

II. Venue

Adams Inc. argues that even if we find that it was subject to the court's jurisdiction, then the district court abused its discretion in denying its motion to transfer venue. Although we would agree that a district court's decision denying a motion to transfer venue is typically reviewed under the abuse of discretion standard,[5] we are not dealing with a typical motion to transfer venue. The motion to transfer venue in the instant case is atypical because it was filed by a third-party defendant. "[S]tatutory venue limitations have no application to Rule 14 claims even if they would require the third-party action to be

---

[5]"A motion to transfer venue is addressed to the discretion of the trial court and will not be reversed on appeal absent an abuse of discretion." *Peteet v. Dow Chemical,* 868 F.2d 1428, 1436 (5th Cir.1989).

17

heard in another district had it been brought as an independent action."  Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, 6 Fed.Prac. & Proc.Civ.2d § 1445 (1990);  *see also Southern Milling Co. v. U.S.,* 270 F.2d 80 (5th Cir.1959) (dictum) ("In the absence of a showing of substantial inconvenience to a third-party defendant, leave to file a third-party complaint should not be denied on the ground of venue.").  "[T]he third-party defendant is protected against an inconvenient forum ... by the requirement that the court have personal jurisdiction over him and the court's ability to take account of venue considerations when exercising its discretion to decide whether to disallow impleader or to sever the third-party claim."  Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 6 Fed.Prac. & Proc.Civ.2d § 1445.  Consequently, we find that the district court did not err when it denied Adams Inc.'s motion to transfer.

III. Summary Judgment

Having determined that the court properly exercised jurisdiction over Adams Inc. and that venue was proper, we turn to Adams Inc.'s challenge to the district court's decision to grant summary judgment to USF & G on its third-party claim.  We conduct a *de novo* review of a district court's grant of summary judgment. *Fireman's Fund Ins. Co. v. Murchison,* 937 F.2d 204, 207 (5th Cir.1991).  No deference is given to the district court and all reasonable inferences from the evidence must be resolved in favor of the nonmovant.  *United States v. Diebold, Inc.,* 369 U.S. 654, 665, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

18

USF & G filed the third-party complaint against Adams Inc. alleging that Adams Inc. was contractually obligated to indemnify and exonerate USF & G for the losses it incurred as a result of USF & G's decision to execute bonds on behalf of Adams Inc. Adams Inc. claimed that it was not obligated to indemnify USF & G because USF & G's decision to pay Gundle on the bond was not made in good faith. In support of this defense, Adams Inc. relied on the following provision of the MSA:

> IV. (A) The liability of [Adams Inc.] shall extend to and include all amounts paid by [USF & G] *in good faith* under the belief that: (1) [USF & G] was or might be liable therefor; (2) such payments were necessary or advisable to protect any of [USF & G's] rights or avoid or lessen [USF & G's] liability or alleged liability; ...
>
> (C) the voucher(s) or other evidence of such payment(s) or an itemized statement of payment(s) sworn to by an officer of [USF & G] shall be prima facie evidence of the fact and extent of the liability of the [Adams Inc.] to [USF & G].

(emphasis added). Adams Inc. contends that because USF & G originally disputed Gundle's claim for payment under the bond, it cannot now claim that the payments it made to Gundle under that bond were made in good faith. Therefore, Adams Inc. argues that a genuine issue of material fact exists as to whether USF & G's decision to pay the bond was made in good faith, thereby precluding summary judgment.

In accordance with the requirements of the MSA, USF & G presented payment vouchers to the district court evidencing the fact and amount of the indemnitors' liability. Those vouchers were sworn to as being valid by a surety claim representative of USF & G. USF & G also presented evidence of the efforts it made to

19

contact Adams Inc. prior to settling with Gundle. This evidence

consisted of a letter written to "Robert Mumma, President, Adams

County Asphalt." In that letter USF & G stated:

> Gundle has offered and demanded to settle this claim for [$121,060.99] until Monday, March 15, 1993, which does not include attorney's fees or interest. If you continue to fail to cooperate immediately, *USF & G will have no choice but to settle this case on the best terms possible under the circumstances, and then seek indemnity from you.*
>
> ... We have attempted to contact you every day this week in an effort to get your assistance in resolving this matter. However, you have failed to return any of our phone calls. As you must certainly realize, your cooperation is imperative; the failure to communicate or even return our phone calls leaves USF & G little choice but to settle on the best terms it can, *by paying up to the amount claimed by Gundle.*

(emphasis in original). The statements contained in this letter

were uncontroverted by Adams Inc. and they belie Adams Inc.'s

contentions that USF & G failed to act in good faith.

> The fact and extent of [a principal's] liability to [the surety] may be prima facie established by vouchers or affidavits. Bad faith on the part of [the surety] may be urged by [the principal] as a defense, but where a genuine issue of material fact in such respect is not raised by the summary judgment evidence, [the principal's] reliance on such defense would be ineffective.

*Ford v. Aetna Ins. Co.,* 394 S.W.2d 693, 698 (Tex.Civ.App.—Corpus

Christi 1965, writ ref'd n.r.e.); *accord Safeco Ins. Co. of*

*America v. Gaubert,* 829 S.W.2d 274, 282 (Tex.App.—Dallas 1992, writ

denied). Because USF & G offered prima facie evidence of its

liability under the bond, and because Adams Inc. failed to present

a genuine issue of material fact that would controvert USF & G's

evidence of its good faith efforts to settle the dispute, we find

that the district court was correct in granting summary judgment to

USF & G.

20

## CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment against Mumma and Kimbob Inc. is VACATED, and, as to them, the action is DISMISSED for lack of personal jurisdiction. The judgment is AFFIRMED as to Adams Inc.